## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| **Plaintiff,** | |
| v. | |
| **OMAR VILLA CARRANZA,** **TROY WAGAMAN,** **JESUS CRUZ RODRIGUEZ,** **MOISES CERVANTES SANCHEZ,** **TIBURCIO AYALA RANGEL,** **and** **ELIZABETH BENITEZ,** | Case No. 25-mj-08098-TJJ **Filed Under Seal** |
| **Defendants.** | |

## CRIMINAL COMPLAINT

I, Tanner Palmer, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

## COUNT 1

On or about May 5, 2025, in the District of Kansas, the defendants,

**OMAR VILLA CARRANZA,**
**TROY WAGAMAN,**
**JESUS CRUZ RODRIGUEZ,**
**MOISES CERVANTES SANCHEZ,**
**TIBURCIO AYALA RANGEL,**
**and**
**ELIZABETH BENITEZ,**

knowingly and intentionally possessed with intent to distribute 500 grams of more of a mixture and substance containing a detectible amount of methamphetamine, a controlled substance.

1.

This was in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(viii), and Title 18, United States Code, Section 2.

## STATEMENT OF FACTS

1.    I am presently employed as a Special Agent with the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), and have been since March 2023.

2.    During my tenure as a Special Agent, I completed approximately 460 hours of training at the Federal Law Enforcement Training Center (FLETC) in the Criminal Investigator Training Program (CITP). After completing CITP, I attended Homeland Security Investigations Special Agent Training (HSISAT), where I completed approximately 536 hours of training. Within my trainings, I have attended and successfully completed courses relating to narcotics investigations, including drug identification, surveillance and counter surveillance tactics, weapons trafficking investigations, federal immigration offenses, federal customs offenses, and contraband smuggling investigations, among other topics.

3.    Prior to my appointment as a Special Agent, I completed approximately 1100 hours of training at the Springfield (MO) Police Academy. I received my Missouri Police Officer Standardized Training certificate upon completion of that academy. I received my Bachelor of Science in Criminology, minor in Spanish, and Undergraduate Certificate in Terrorism and National Security, with honors, at Missouri State University.

4.    I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations and to make arrest for offenses enumerated in Section 2516 of Title 18. I am further authorized by law to conduct investigations that relate to the illicit traffic in

and importation of illicit contraband into the United States, as well as the movement, smuggling, or laundering of currency contrary to law. I am currently assigned to the HSI Kansas City Smuggling Group. As a HSI Special Agent, I have conducted surveillance of Drug Trafficking Organizations (DTOs), executed search warrants, planned and assisted in the controlled purchases of illegal controlled substances, and investigated DTOs and other criminal organizations.

5.      Beginning on or about January 28, 2025, a Kansas Bureau of Investigation (KBI) confidential informant (CI) was in contact with Manuel CUELLAR-AMEZQUITA (hereinafter referred to as M. CUELLAR-AMEZQUITA) regarding the purchase of methamphetamine. This CI has been proven reliable, based on information that was independently corroborated by investigators, and is working for monetary value. The CI communicated with M. CUELLAR-AMEZQUITA via M. CUELLAR-AMEZQUITA's phone number ((913) 553-7370). On March 17, 2025, the CI contacted M. CUELLAR-AMEZQUITA about arranging a 15-kilogram purchase of methamphetamine. Up to the date of March 17, 2025, the CI and a KBI Undercover Agent (UCA) had purchased approximately 9.8 pounds of methamphetamine over the course of five different dates involving five different drug transactions. M. CUELLAR-AMEZQUITA'S nephew, Jorge GARCIA-CUELLAR (hereinafter referred to as J. CUELLAR) and a Hispanic male known as FERNANDO LAST NAME UNKNOWN (hereinafter referred to as FERNANDO LNU) were also involved by helping to facilitate the distribution for these transactions.

6.      On March 28, 2025, the CI coordinated with M. CUELLAR-AMEZQUITA to purchase 15 kilograms of methamphetamine at the Mi Pueblito Supermarket, 1311 Minnesota Avenue, Kansas City, Kansas. M. CUELLAR-AMEZQUITA arrived with

FERNANDO LNU to meet with the CI and UCA in the Mi Pueblito parking lot. M.

CUELLAR-AMEZQUITA arranged for a black Dodge Ram pickup (bearing Missouri

license plate number 9DFMG8) to arrive with the 15 kilograms of methamphetamine. Once

the black Dodge Ram arrived, the methamphetamine (concealed within two five-gallon paint

buckets in the pickup's bed) would be shown to the UCA. Investigators later learned Elder

Gomez TABORA drove the black Dodge Ram to the meet site. Another vehicle, a white

Ford Escape (bearing Kansas license plate number 1227ACH) was also in the parking lot

waiting for the methamphetamine transaction to be completed. Investigators later discovered

the white Ford Escape was driven by Uriel BALDERAS (hereinafter referred to as U.

BALDERAS) and had J. CUELLAR as a back seat passenger. J. CUELLAR was involved in

one of the previous methamphetamine transactions on February 18, 2025. Prior to the

methamphetamine transfer, law enforcement arrived in the Mi Pueblito parking lot, which

caused the involved vehicles to move locations.

    7.    The vehicles involved in this transaction were subsequently stopped by law

enforcement. These vehicles consisted of a maroon Ford van, a white Ford Escape, and a

Dodge Ram pickup truck. A search of the Dodge Ram truck revealed two gray five-gallon

paint cans, located in the truck bed, which contained 15 plastic bags of a crystal substance. A

KBI Senior Special Agent field tested the substance and received a presumptive positive

result for methamphetamine. The plastic bags, containing the methamphetamine, weighed

approximately 15,218 grams.

    8.    Following his arrest, U. BALDERAS agreed to speak with investigators. After

waiving his *Miranda* Rights, U. BALDERAS said he was from Emporia, Kansas. U.

BALDERAS said he came to Kansas City, Kansas (in the white Ford Escape) to meet with J.

CUELLAR to pick up a methamphetamine package to take back to Emporia, Kansas. U. BALDERAS was supposed to give one of the packages to an unknown male known as 'Omar.' After he arrived in Kansas City, U. BALDERAS said he met an unknown male, dressed in a blue shirt, at a residence off of Parkwood Boulevard, Kansas City. U. BALDERAS said he gave this unknown male a ride to an area near 13th Street and Minnesota Avenue, Kansas City, Kansas. At this location, J. CUELLAR entered U. BALDERAS' white Ford Escape via the rear passenger's seat. They (U. BALDERAS and J. CUELLAR) drove to a business near 1311 Minnesota Avenue, Kansas City, Kansas, where the unknown male in the blue shirt departed U. BALDERAS' Ford Escape. While sitting near the business, U. BALDERAS observed law enforcement arrive. After the other vehicles departed, J. CUELLAR told U. BALDERAS to follow the other two vehicles. U. BALDERAS was able to follow the maroon van for a brief time before losing it. U. BALDERAS said he was later stopped by law enforcement and arrested. Investigators recovered U. BALDERAS' phone (identified as a black Apple iPhone, with a lock screen photograph of Uriel Jose BALDERAS and an unknown female, and a red and black "Aitotem" protective case) from the white Ford Escape driver's floorboard.

9. Following his arrest, J. CUELLAR agreed to speak with investigators. After waiving his *Miranda* Rights, J. CUELLAR said U. BALDERAS brought methamphetamine with him in the white Ford Escape from Emporia, Kansas. J. CUELLAR drove the maroon van (previously identified on prior drug transactions) to meet U. BALDERAS at a location near 9th Street and Parkwood Boulevard, Kansas City, Kansas. J. CUELLAR, M. CUELLAR-AMEZQUITA, and FERNANDO LNU were all working at another location and drove to this residence near 9th Street and Parkwood Boulevard to meet U. BALDERAS. At

the residence near 9th Street and Parkwood Boulevard, J. CUELLAR said that U.

BALDERAS pulled a cardboard box, containing methamphetamine, from the white Ford

Escape's rear hatch compartment. The methamphetamine (sealed in plastic bags) was

removed from the box and transferred into two 5-gallon paint buckets in the back of his (J.

CUELLAR's) black Dodge Ram truck. J. CUELLAR drove the maroon van to Mi Pueblito,

1311 Minnesota Avenue, Kansas City, Kansas. The black Dodge Ram truck was driven to

the same location by another individual (J. CUELLAR did not identify U. BALDERAS). J.

CUELLAR said they were there to meet someone (the KBI CI) for a drug transaction that

was arranged by M. CUELLAR-AMEZQUITA. J. CUELLAR said the transaction was

facilitated by cell phone communication by the CI. J. CUELLAR said he entered the white

Ford Escape and left before being stopped by law enforcement.

10.    On March 28, 2025, investigators seized a black Apple iPhone, with a lock screen

photograph of Uriel Jose BALDERAS and an unknown female, and a red and black

"Aitotem" protective case, from the white Ford Escape driven by U. BALDERAS.

Investigators determined this cell phone belonged to U. BALDERAS from the photograph on

the screen saver and location it was discovered.

11.    On March 29, 2025, a HSI TFO received a Federal search warrant for U.

BALDERAS' phone. A search of the phone provided conversations between U.

BALDERAS and another contact in BALDERAS' phone (hereinafter referred to as

'OMAR'). Through text messaging on WhatsApp, OMAR directed U. BALDERAS to pick

up two packages to deliver to 1320 Minnesota Avenue, Kansas City, Kansas, on the

afternoon of March 28, 2025. OMAR told U. BALDERAS to pick them up at OMAR'S

residence (determined to be 867 West 5th Avenue, Emporia, Kansas through geolocation

6

data on the cellphone). U. BALDERAS left the location tracking enabled on his phone, which allowed investigators to observe the locations U. BALDERAS connected with while traveling in his vehicle. A further search of location data showed U. BALDERAS had been to 1296 Road D, Emporia, Kansas on March 27, 2025.

12.     On April 22, 2025, I spoke with law enforcement officers regarding border crossings as reported through the United States Customs and Border Protection (CBP). CBP had a record of a white 1998 Van Hool Passenger Bus, bearing Texas license plate VLN1799, and Vehicle Identification Number (VIN) YE2TA62B7W2040509 (hereinafter referred to as "the Van Hool bus"), with border crossings for three different dates: March 8, 2025; March 29, 2025; and April 12, 2025. The Van Hool bus was identified as a commercial charter bus, like those used for large group trips. On two of the crossings into the United States (March 8, 2025, and April 12, 2025), there were only four people in the bus. On the March 29, 2025 crossing, there were no passengers on the bus. The driver for the April 12, 2025 crossing (Victor David DIAZ COLIN) indicated he was paid $1,000 for driving the bus, when asked by USBP Officers during an inspection at the point of entry in Eagle Pass, Texas. The bus trip consisted of stops in San Antonio and Dallas, Texas, and the bus returned to Piedras Negras, Mexico. This conflicted with License Plate Reader (LPR) information, which showed the bus (on all trips into the United States) traveling to Emporia, Kansas, before returning to Mexico. The trips into the United States, as reflected through LPR data, revealed the dates as March 8, 2025; March 29, 2025; and April 12, 2025. All of these dates of entry occurred on a Saturday. All of the LPR reads showed the furthest north read in Emporia, Kansas. On March 8, 2025, the amount of time between the Emporia northbound and southbound reads was approximately 28 hours. On the March 29, 2025 trip,

7

the time between the Emporia north and southbound reads was approximately 33 hours. On the April 12, 2025 trip, the time between the Emporia north and southbound reads was approximately 29 hours.

13. Due to the suspicious nature of the Van Hool bus and the lack of passengers, a secondary inspection was conducted by CBPOs. During that inspection, officers observed several aftermarket anomalies, including tampered bolts around the fuel tank area. These bolts appeared recently replaced and were concealed with rubber caps. These CBPOs knew that the use of rubber caps placed over tamper bolts are a common tactic Drug Trafficking Organizations (DTOs) employ to disguise modifications intended to conceal hidden compartments used to transport narcotics or other contraband.

14. Based on the totality of the circumstances, and to avoid alerting the bus driver, law enforcement installed a tracking device on the Van Hool bus during the secondary inspection. At the time of installation, the vehicle was located within the Western District of Texas and was accomplished utilizing border search authority. After installing the tracker and within the requisite timeframe, investigators obtained a GPS warrant through the United States District Court for the Western District of Texas. No search produced any substance involving methamphetamine, but one of the officers observed a crystal substance located around the bus's gas cap area of the fuel tank. In my training and experience, this can be significant, because if liquid methamphetamine is stored in a fuel tank and later removed for the conversion process, any liquid spilling around the gas cap area will dry and crystallize. This will form methamphetamine crystals.

15. Although the vehicle has undergone numerous ownership transfers, current intelligence indicates that it is operated under the direction of Raul Dominguez-Hernandez,

8

an individual associated with previous major narcotics trafficking incidents, including the seizure of $129,000 in bulk U.S. currency and 17 kilograms of heroin from commercial buses he owned and operated.

16.     On April 22, 2025, a KBI agent spoke with law enforcement officers from the Emporia Police Department (EPD). EPD had a Confidential Source (CS) who provided information about Troy WAGAMAN. WAGAMAN has lived at 1296 Road D, Emporia, Kansas for approximately 16 years and the CS has known WAGAMAN for over 20 years. This CS has provided reliable information which was verified by the EPD. The CS said WAGAMAN had a drug problem for approximately four years. WAGAMAN had been using small amounts of what the CS believed to be controlled substances, but recently had changed some of his patterns. These changes included WAGAMAN staying away from the residence for days at a time, having people showing up to the residence at odd hours of the day, and beginning to hang around unknown Hispanic males. The CS showed EPD officers photographs dating from 2023 through April 2025. These photographs consisted of cut straws, empty plastic bags, scales, spoons, and shrink wrap for wires, all of which were covered with a white powdery substance. These photographs were taken inside the residence at 1296 Road D, Emporia, Kansas, in the gun safe, in WAGAMAN'S vehicles, and around the shop. The "shop" the CS described is a large white metal building with a gray roof, and a white garage door, located to the east of the 1296 Road D residence. The CS also located plastic bags containing a white powdery substance with a rolled dollar bill taped under WAGAMAN'S bedframe inside the residence. The CS commonly discovered plastic baggies containing a white residue (the CS believed to be cocaine) in WAGAMAN'S pants pockets when the CS did laundry.

17. The CS said WAGAMAN has had a large shipping container for approximately eight years. Investigators identified this large shipping container (white with rust on it) sits east of the "shop" building. On March 30, 2025, the CS noticed that WAGAMAN moved it out of sight and put padlocks on the doors. A hole was cut so that power could be run into the shipping container. There were also five to six 25-gallon capacity (approximately) blue barrels sitting next to the shipping container which were tied together. The CS had never observed them before. WAGAMAN works for a functional farm and has many barrels used for spraying, but the blue barrels were never used for farm work. The CS has no knowledge what the barrels would be used for and has extensive knowledge about farm work. Subsequent to noticing the container was moved, WAGAMAN told the CS the floor of the shipping container got wet, so he moved a fan into it which needed power so that the floor could be dried. The CS also noticed a chemical smell on WAGAMAN'S clothes. The CS did not believe it was from spraying, because it was the wrong time of year for when they normally sprayed.

18. The CS asked WAGAMAN about a bus with a Texas license plate VLN1799 (the Van Hool bus), the CS observed at WAGAMAN'S "shop" on Sunday, March 30, 2025. WAGAMAN informed the CS the bus was there so that he could fix an axle, although the CS knew WAGAMAN did not have the equipment needed to do so. The CS observed the driver of a gray GMC Sierra, with a Kansas license plate number 896REC, registered to Lucero AYALA-RANGEL, move the bus in and out of the "shop" several times on March 30, 2025. Investigators are aware this "shop" is a large white metal building with a gray roof and a white garage door that sits to the east of the 1296 Road D, Emporia, Kansas residence. Other unknown Hispanic males were there with WAGAMAN, none of whom the CS had observed

10

before. One of the Hispanic males went to the shipping container and came back to the "shop" with an object wrapped inside of a camouflage tarp. The "shop" door was immediately lowered after this male entered the "shop" carrying the unknown item. It appeared the unknown male wore some sort of face mask. The bus was able to pull all the way inside the "shop." After the bus pulled in, the large "shop" door was shut behind the bus.

19.    The CS showed investigators a photograph of a Chevrolet sedan (bearing Kansas license plate number 071RAN) with unique body damage. Emporia Police officers observed this Chevrolet sedan numerous times at 867 West 5th Avenue, Emporia, Kansas - the same residence U. BALDERAS is believed to have picked up methamphetamine on March 28, 2025. Emporia Police officers observed another white vehicle, with Kansas license plate number 2530AHZ, registered to AYALA-RANGEL, at the 867 West 5th Avenue address numerous times.

20.    On April 29, 2025, WAGAMAN was stopped by the EPD for speeding on a motorcycle. WAGAMAN did not possess a valid Kansas driver's license for the motorcycle. During the stop, EPD Officers searched WAGAMAN and located approximately 11 grams of a white powdery substance on his person. A field test was conducted which showed a presumptive positive for the presence of cocaine. WAGAMAN was arrested and subsequently bonded out the following day.

21.    On May 3, 2025, I was notified the Van Hool bus was leaving a location in southern Mexico and driving north toward the United States border. On May 4, 2025, at approximately 4:54 a.m., the Van Hool bus (bearing Texas license plate number VLN1799) arrived at the Eagle Pass International Bridge for primary inspection. The Van Hool bus was

11

driven by Victor DIAZ COLON (the same driver from the April 12, 2025, crossing) and had four adult and three juvenile passengers on board. CBPOs referred the Van Hool bus for secondary inspection. During the secondary inspection, CBPOs ran a police canine around the Van Hool bus. The police canine alerted to the presence of controlled substances on or around the Van Hool bus. CBPOs took a sample of a liquid substance, found in a secondary tank within the Van Hool bus's gas tank. The liquid sample tested presumptive positive for the presence of methamphetamine. HSI Eagle Pass responded to the location, and utilizing border search authority, installed a second tracking device for redundancy purposes. At approximately 7:12 a.m., CBPOs released the Van Hool bus. HSI agents followed the Van Hool bus northbound from the Eagle Pass International Bridge. At approximately 12:46 p.m., the Van Hool bus stopped in Austin, Texas, and dropped off a passenger. At approximately 2:30 p.m., HSI agents observed the Van Hool bus stop in Dallas, Texas, and drop off what they believed to be the remaining passengers (leaving only the bus driver on board). While still in Dallas, DIAZ COLON relinquished control of the bus to Moises CERVANTES SANCHEZ. The Van Hool bus continued to travel north toward Emporia, Kansas. An anticipatory search warrant was obtained through the United States District Court of the District of Kansas (Case No. 25-mj-8097-ADM) for the Van Hool bus after it arrived at 1296 Road D, Emporia, Kansas. The warrant authorized the search for a white rusted shipping container, the large white metal shop with a gray roof, and the Van Hool bus located on the property at 1296 Road D, Emporia.

22.      On May 4, 2025, at approximately 10:24 p.m., the Van Hool bus arrived at the Flying J Travel Center, 4215 US-50, Emporia, Kansas. HSI agents (conducting surveillance on the bus) observed a white Ford Explorer, with a black hood and black front fenders, pick

up the bus driver (later identified as Moises CERVANTES SANCHEZ). CERVANTES
SANCHEZ carried a duffel bag with him to the white Ford Explorer. HSI was unable to get
the Ford Explorer's license plate. On May 5, 2025, at approximately 12:15 a.m., Emporia
Police Department (EPD) detectives conducted a spot check of the residence located at 867
West 5th Avenue, Emporia, Kansas. Detectives observed a white Ford Explorer, with a
black hood and black front fenders, bearing a Kansas 60-day temporary license plate
D895597, parked in the driveway at 867 West 5th Avenue, Emporia, Kansas.

23.    On May 5, 2025, at approximately 6:30 a.m., EPD detectives began surveillance
at 867 West 5th Avenue, Emporia, Kansas. At approximately 7:30 a.m., a Chevrolet Sonic,
bearing Kansas license plate 071RAN, arrived at 867 West 5th Avenue residence. The
driver, later identified as Jesus CRUZ RODRIGUEZ, exited the Sonic and entered the
residence. At approximately 8:09 a.m., a white Chevrolet Silverado arrived and backed up
into the residence's driveway. The Silverado's driver (later identified as Tiburcio AYALA
RANGEL) wore a long-sleeve gray sweatshirt with a red hat and went inside the residence.
A heavy-set Hispanic female (possibly Elizabeth BENITEZ) exited the residence and went
out to the vehicles, making approximately five separate short trips. At approximately 8:19
a.m., Jesus CRUZ RODRIGUEZ and Tiburcio AYALA RANGEL exited the 867 West 5th
Avenue residence carrying a large black object, which they put in the bed of the Chevrolet
Silverado. Jesus CRUZ RODRIGUEZ and Tiburcio AYALA RANGEL entered the
Chevrolet Silverado and departed the residence westbound. At approximately 8:24 a.m., the
same Chevrolet Silverado returned and pulled in front of the 867 West 5th Avenue residence.
The Silverado's front passenger exited the truck, entered the 867 West 5th Avenue residence,

and quickly returned to the vehicle. The Chevrolet Silverado then departed the residence with AYALA RANGEL and CRUZ RODRIGUEZ.

24.    At approximately 6:45 a.m., EPD detectives initiated surveillance at WAGAMAN'S residence, 1296 Road D, Emporia, Kansas. At approximately 7:12 a.m., a white Sports Utility Vehicle (SUV) departed the property. At approximately 8:19 a.m., WAGAMAN exited the 1296 Road D, Emporia, Kansas residence (wearing blue jeans, a black shirt, and a black baseball cap) and walked toward the shop. At approximately 8:46 a.m., the same white Chevrolet Silverado (observed at the 867 West 5th Avenue residence) pulled into the driveway of the 1296 Road D residence. EPD officers observed, via aerial surveillance, observed several large black bags in the Chevrolet Silverado's bed. The Silverado's passenger exited the truck wearing a white/light colored shirt and blue jeans. The passenger went into the shop for several minutes before returning to the Silverado. At approximately 8:59 a.m., WAGAMAN began moving and repositioning vehicles around the large white shop. At approximately 9:07 a.m., the Van Hool bus arrived onto the WAGAMAN'S property and drove into the shop. One of the males from the shop exited and got the items in the Chevrolet Silverado's bed to take inside the shop. One of these items in the truck bed appeared to be a large blue bucket with a lid.

25.    At approximately 9:31 a.m., investigators executed the federal anticipatory search warrant on the shipping container, Van Hool bus, and shop. Investigators detained five subjects: Troy WAGAMAN, Tiburcio AYALA RANGEL, Omar VILLA CARRANZA, Moises CERVANTES SANCHEZ, and Jesus CRUZ RODRIGUEZ. Both CERVANTES SANCHEZ and CRUZ RODRIGUEZ were departing together in the white Chevrolet

14

Silverado. The others were on the property when they were encountered. Upon securing the scene, all five detainees were transported to the Emporia Police Department for interviews.

26.    Following his arrest, Tiburcio AYALA RANGEL agreed to speak with investigators. After waiving his *Miranda* Rights, AYALA RANGEL admitted to distributing cocaine to WAGAMAN but denied converting liquid methamphetamine. AYALA RANGEL said he was picked up by Jesus CRUZ RODRIGUEZ near AYALA RANGEL's residence at 1302 East Street, Emporia, Kansas. CRUZ RODRIGUEZ drove a white pickup and took him (AYALA RANGEL) to another residence near 5th and West Streets, Emporia, Kansas, where they picked up Omar VILLA CARRANZA. They drove straight from VILLA CARRANZA's residence to WAGAMAN's residence. AYALA RANGEL went out to the shop (WAGAMAN's residence) to check brakes and fluids for the bus. AYALA RANGEL said he did this previously when the bus came up approximately a month and a half ago. AYALA RANGEL did not have any brakes to replace or oil filters to change, but checked the bus for the next time it arrived in the area. A Kansas Gas Service receipt, billed to Uriel BALDERAS (at 1302 East Street, Emporia, Kansas), and a Community National Bank Visa Card, showing BALDERAS as the account holder, were located in AYALA RANGEL's wallet.

27.    Following his arrest, Troy WAGAMAN agreed to speak with investigators. After waiving his *Miranda* Rights, WAGAMAN said he had been purchasing cocaine from AYALA RANGEL for several years and up to an ounce every other week. Around the start of 2025, AYALA RANGEL introduced WAGAMAN to Michael (Miguel AYALA, hereinafter referred to as M. AYALA [Tiburcio AYALA RANGEL's nephew]). M. AYALA asked WAGAMAN about renting out a section of his shop to offload product/merchandise.

15

M. AYALA provided and used a phone number of 620-261-1736 to communicate with WAGAMAN for these ventures and said the bus would only be there for six to eight hours to offload. WAGAMA was initially promised $3,000 per trip and an ounce of cocaine. WAGAMAN claimed he was unfamiliar with the methamphetamine conversion process but assisted M. AYALA with setting up the conversion location and providing a deep freeze and shipping container. WAGAMAN said a bus had been to his farm four times. The bus had the same driver (Moises CERVANTES SANCHEZ, hereinafter referred to as CERVANTES SANCHEZ) every time the bus arrived. The same people at the farm today (AYALA RANGEL, CRUZ RODRIGUEZ, and VILLA CARRANZA) were there on previous times the bus arrived there to offload. AYALA RANGEL, CRUZ RODRIGUEZ, and VILLA CARRANZA would provide the driver a ride back into town since the driver did not stay during the offloading process. WAGAMAN said the same person did not always take CERVANTES SANCHEZ back to town, as it rotated between them. WAGAMAN described the unloading process as removing liquid from the bus, placing the liquid into several two-handled totes/buckets, and placing the totes into the shipping container. WAGAMAN said a strong chemical is used during this process and AYALA RANGEL, CRUZ RODRIGUEZ, and VILLA CARRANZA would go back and forth from the shop to the shipping container. WAGAMAN had only been paid the $3,000 once for this process, but was given an ounce of cocaine every time the bus came up. WAGAMAN was upset he did not receive the $3,000 promised on the other trips.

28.    Following his arrest, Moises CERVANTES SANCHEZ agreed to speak with investigators. After waiving his *Miranda* rights, CERVANTES SANCHEZ said he was a commercial bus driver attempting to start his own company. CERVANTES SANCHEZ had

been a commercial bus driver for approximately one year. Due to issues with the Department of Transportation (DOT) licensing, CERVANTES SANCHEZ was unable to continue his personal transportation business. As such, CERVANTES SANCHEZ had recently been working for a different business as a bus driver. In this capacity, CERVANTES SANCHEZ picked up a bus (the Van Hool bus) from an unknown individual in Dallas or Fort Worth, Texas. CERVANTES SANCHEZ then drove the bus north to Emporia, Kansas. CERVANTES SANCHEZ said he dropped off passengers in Oklahoma before traveling to Emporia, Kansas. HSI agents, who were following the Van Hool bus on its journey north, observed all the bus passengers were dropped off before CERVANTES SANCHEZ picked up the bus. The only stop made in Oklahoma was at a gas station to refuel. CERVANTES SANCHEZ said he received $400.00 USD per trip, plus payment for food.

29. CERVANTES SANCHEZ said he drove the bus to Emporia, Kansas to scout potential stop locations for his future business, despite indicating his trip was on behalf of a different company. When he arrived in Emporia, CERVANTES SANCHEZ was instructed (by unknown individual(s)) to leave the Van Hool bus at Flying J truck stop (4215 US-50, Emporia, Kansas) due to mechanical problems. CERVANTES SANCHEZ did not think the bus was having issues, but followed the instructions. After arriving at the Flying J, CERVANTES SANCHEZ said he met with a man in a hoodie. CERVANTES SANCHEZ said the man in the hoodie arrived in a white Ford Explorer with a black hood and black bumpers. Investigators believe this to be Omar VILLA CARRANZA. VILLA CARRANZA then drove CERVANTES SANCHEZ to a Super 8, where CERVANTES SANCHEZ said he stayed the night. CERVANTES SANCHEZ provided consent to search his Super 8 hotel room. HSI agents responded to the Super 8 and confirmed CERVANTES SANCHEZ rented

17

a room. Investigators searched the room, which showed no signs of overnight use. The bed

appeared well-made, no pillows were moved, and the bathroom towels were unused.

Investigators located a Burger King bag containing an uneaten hamburger and fries.

Investigators seized several receipts from the hotel room, one of which was a gas receipt

from an Oklahoma gas station for $100.00 USD.

30.     Following his arrest, Jesus CRUZ RODRIGUEZ agreed to speak with

investigators. After waiving his *Miranda* Rights, CRUZ RODRIGUEZ said he is a mechanic

apprentice for WAGAMAN. CRUZ RODRIGUEZ said he was informed the Van Hool bus

was leaking oil and needed to be repaired. CRUZ RODRIGUEZ said this was the second

time he (CRUZ RODRIGUEZ) had fixed the oil system on the bus. CRUZ RODRIGUEZ

said when he was encountered by law enforcement, he was taking CERVANTES SANCHEZ

to lunch. CRUZ RODRIGUEZ said he was also friends with AYALA RANGEL, as they

worked together as mechanics. CRUZ RODRIGUEZ was paid $500.00 USD the last time he

fixed the Van Hool bus.

31.     Following his arrest, Omar VILLA CARRANZA agreed to speak with

investigators. After waiving his *Miranda* Rights, VILLA CARRANZA said he was a

mechanic working on the Van Hool bus. VILLA CARRANZA said the bus had oil

problems, so "they" were trying to fix that before its next trip. VILLA CARRANZA claimed

to have no knowledge of the controlled substances within the bus. VILLA CARRANZA

knew the bus made two to three prior trips to Emporia. VILLA CARRANZA alluded to

being the "supervisor" of the operation, so he just completed different tasks concerning the

bus operation. VILLA CARRANZA had a significant amount of cash in his wallet

(consisting of 35 $100.00 USD bills, three $20.00 USD bills, and various other smaller USD

bills and Mexican Pesos). VILLA CARRANZA knew the bus came from Michoacan, Mexico. Based on investigators' prior involvement with a 15 kilogram methamphetamine seizure on March 28, 2025, they were familiar with VILLA CARRANZA's role in methamphetamine trafficking.

32.    During the interviews, HSI and KBI agents continued the search of the ranch at 1296 Road D, Emporia, Kansas. During a search of the white Chevrolet Silverado (driven by CRUZ RODRIGUEZ and CERVANTES SANCHEZ), investigators found approximately $20,000 USD in the passenger side of the vehicle, where CERVANTES SANCHEZ was seated. An evidentiary search of the white/rusted shipping container yielded a methamphetamine conversion laboratory, used to convert liquid methamphetamine into crystalline methamphetamine. An evidentiary search of the shop (a large white metal building with a gray roof) yielded approximately 75 firearms stored in various safes. After several hours, investigators gained access to the false compartment in the Van Hool bus's gas tank and removed suspected liquid methamphetamine. At this time, the clandestine laboratory processing team estimates there to be approximately 88 to 96 gallons of liquid methamphetamine inside the gas tank.

33.    Based on the foregoing information and their own surveillance, EPD obtained a State of Kansas search warrant for 867 West 5th Avenue, Emporia, Kansas on May 5, 2025. Immediately after signing the search warrant, EPD observed a female (identified as Elizabeth BENITEZ) depart the 867 West 5th Avenue residence in a black Kia Forte bearing Kansas license plate OMWTSSD. EPD detectives conducted a traffic stop on BENITEZ's vehicle, detained her, and transported her to EPD. Upon executing the residential search warrant that afternoon, EPD and HSI investigators discovered what appeared to be a second clandestine

19

laboratory. Investigators located countless large shards of a crystalline substance covering the floor of a bedroom, which field tested presumptive positive for the presence of methamphetamine. Investigators estimate there was approximately 131 pounds of finished methamphetamine in the residence. Investigators further discovered a barrel filled with water, which was consistent with the barrels/tubs located at WAGAMAN's ranch. In a back room of the residence—a shared laundry room open in view for any occupants of the residence—investigators located a methamphetamine conversion lab. Methamphetamine shards and residue were visible on the floor throughout all areas of the residence. Due to the potential safety concerns, investigators exited the residence, pending a clandestine laboratory processing team.

34.    Based on the location of the conversion laboratory, as well as the amount of converted methamphetamine within the residence, I believe any resident of 867 W 5th Street would be aware of the methamphetamine conversion laboratory operation. I arrived at 867 W 5th Street, Emporia, Kansas, after the execution of the warrant. Clandestine laboratory teams had already begun the process of airing out the residence to make it safe for entry. Even though most of the windows were open, and fans were running, I could still smell the strong smell of chemicals used in the conversion of methamphetamine. While waiting for a conversion laboratory disposal team, I was informed by an EPD detective that neighbors had reported heavy traffic in and out of the 867 W 5th Avenue address, which I know to be consistent with that of drug trafficking. Based on my observations, and statements from other law enforcement officers, I believe BENITEZ was aware of VILLA CARRANZA's drug trafficking operation. Furthermore, BENITEZ facilitated VILLA CARRANZA's drug trafficking operation by providing him with cell phones. Additionally, EPD detectives

informed me that utility checks for water services at 867 W 5th Street showed BENITEZ as the principal payer, which I recognize to be consistent with attempts to distance VILLA CARRANZA from the drug manufacturing operation.

35.    Following her arrest, Elizabeth BENITEZ agreed to speak with investigators. BENITEZ waived her *Miranda* Rights and said she lived at 867 West 5th Avenue, Emporia, Kansas, for approximately two months. BENITEZ lived with Omar VILLA CARRANZA. BENITEZ said she purchased four phones for VILLA CARRANZA. BENITEZ said VILLA CARRANZA drove a white Ford Explorer with a black hood and black bumpers. BENITEZ said the night before her arrest (May 4, 2025), VILLA CARRANZA left the residence wearing a black hoodie. VILLA CARRANZA returned later that evening with an unidentified male subject. Investigators later searched BENITEZ's vehicle and located a small bag of methamphetamine in the center console and approximately $1,300 United States Currency in her purse.

36.    BENITEZ's statements corresponded with the timeframe of the May 4, 2025 observations by HSI agents of VILLA CARRANZA arriving at the Flying J to pick up CERVANTES SANCHEZ. I believe, due to the lack of disturbance of the bed and bathroom at the Super 8 hotel, that CERVANTES SANCHEZ stayed overnight at the 867 West 5th Avenue address.

37.    Based on the aforementioned, there is probable cause to believe Omar VILLA CARRANZA, Troy WAGAMAN, Jesus CRUZ RODRIGUEZ, Moises CERVANTES SANCHEZ, Tiburcio AYALA RANGEL, and Elizabeth BENITEZ did knowingly and intentionally possessed with intent to distribute 500 grams of more of a mixture and substance containing a detectible amount of methamphetamine, a controlled substance.

21

38.     I respectfully request a warrant for the arrests of Omar VILLA CARRANZA,

Troy WAGAMAN, Jesus CRUZ RODRIGUEZ, Moises CERVANTES SANCHEZ,

Tiburcio AYALA RANGEL, and Elizabeth BENITEZ be issued for violating Title 21,

United States Code, Sections 841(a)(1), 841(b)(1)(A)(viii), and Title 18, United States Code,

Section 2, that is, knowing and intentional possession, with intent to distribute, 500 grams of

more of a mixture and substance containing a detectible amount of methamphetamine, a

controlled substance.


FURTHER AFFIANT SAYETH NAUGHT.

Respectfully submitted,


Special Agent Tanner J. Palmer
Homeland Security Investigations


Subscribed and sworn to before me on this __6th__ day of May 2025, after first having been

transmitted via reliable electronic means.


HONORABLE TERESA J. JAMES
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF KANSAS

22

## PENALTIES

### Count 1 [21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), and 18 U.S.C. § 2]

• Punishable by a term of imprisonment of not less than ten (10) years and no more than life. 21 U.S.C. § 841(b)(1)(A).

• A term of supervised release of at least five (5) years. 21 U.S.C. § 841(b)(1)(A).

• A fine not to exceed $10 million. 21 U.S.C. § 841(b)(1)(A).

• A mandatory special assessment of $100.00. 18 U.S.C. § 3013(a)(2)(A).

If the defendant commits such a violation after a prior conviction for a serious drug felony or serious violent felony has become final, the penalties are:

• A term of imprisonment of not less than fifteen (15) years and no more than life. 21 U.S.C. § 841(b)(1)(A).

• A term of supervised release of at least ten (10) years. 21 U.S.C. § 841(b)(1)(A).

• A fine not to exceed $20 million. 21 U.S.C. § 841(b)(1)(B).

• A mandatory special assessment of $100.00. 18 U.S.C. § 3013(a)(2)(A).

If the defendant commits such a violation after two prior convictions for a serious drug felony or a serious violent felony has become final, the penalties are:

• A term of imprisonment of not less than twenty-five (25) years and no more than life. 21 U.S.C. § 841(b)(1)(A).

• A term of supervised release of at least ten (10) years. 21 U.S.C. § 841(b)(1)(A).

• A fine not to exceed $20 million. 21 U.S.C. § 841(b)(1)(B).

• A mandatory special assessment of $100.00. 18 U.S.C. § 3013(a)(2)(A).